# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Gary and Caryl Luis, Gary A. Mentz, and Michael and Merri Vitse, *individually and on behalf of all others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> RBC Capital Markets, LLC, <br><br> Defendant. | Case No. 16-cv-3873 (SRN/DTS) <br><br><br><br> **MEMORANDUM OPINION AND ORDER** |

Gregg M. Fishbein and Vernon J. Vander Weide, Lockridge Grindal Nauen PLLP, 100 Washington Avenue South, Suite 2200, Minneapolis, MN 55401; Daniel E. Gustafson, Daniel C. Hedlund, David A. Goodwin, and Eric S. Taubel, Gustafson Gluek PLLC, 120 South Sixth Street, Suite 2600, Minneapolis, MN 55402; and Scott D. Hirsch, Scarlett & Hirsch PA, 7301 West Palmetto Road, Suite 207A, Boca Raton, FL 33433, for Plaintiffs.

James K. Langdon, Kirsten E. Schubert, and Michael E. Rowe, Dorsey & Whitney LLP, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

This is a one-count, breach of contract dispute between a putative class of investors ("Plaintiffs") and a financial brokerage firm, RBC Capital Markets, LLC ("RBC"), over the manner in which RBC sold Plaintiffs a complex financial product called a "reverse convertible note," or "RCN." In short, Plaintiffs contend (1) that their contract with RBC required RBC to abide by certain financial industry regulations, (2) that RBC failed to abide by those regulations when it sold them RCNs, and (3) that RBC must accordingly be held liable for that breach of contract, on a class-wide basis. RBC

disagrees, and argues that, because the at-issue contract did *not* require RBC to abide by the at-issue regulations, Plaintiffs' breach of contract claim fails as a matter of law. RBC also contends that, in any event, it did not violate any applicable regulations. Plaintiffs have now moved to certify a class of affected investors, and RBC has simultaneously moved for summary judgment.

At the motion to dismiss stage of this case, the Court agreed with Plaintiffs, and found that their complaint stated a plausible breach of contract claim. In light of the evidence gathered during discovery, however, it is now clear that the plain language of the at-issue contract, along with the relevant case law, support RBC's view of the case. In contracting with Plaintiffs, RBC did not promise to abide by the at-issue financial industry regulations, and, consequently, Plaintiffs cannot base a breach of contract claim on RBC's failure to comply with those regulations.

The Court accordingly grants RBC's motion for summary judgment, and denies Plaintiffs' motion for class certification as moot.

## I. BACKGROUND

Although this case's outcome centers largely around a one-paragraph contractual provision, called the "Applicable Laws and Regulations" provision, for the sake of thoroughness, the Court will nonetheless provide a more detailed accounting of this litigation's factual and procedural background below. The Court hopes this background proves useful in explaining how, exactly, the "Applicable Laws and Regulations" provision came to play the role in this litigation that it did.

### A. Factual Background

1. *The Parties*

Michael and Merri Vitse, Susan Millering, and Lois Boelter are the named

Plaintiffs in this putative class action (collectively, "Plaintiffs").[1] Plaintiffs seek to

represent a class of certain individuals who invested in "reverse convertible notes"

("RCNs"), from January 26, 2010 to the present, and who lost money as a result of that

investment. (*See* Pl.'s Br. in Support of Class Certification [Doc. No. 72] ("Pls.' Cert.

Br.") at 4-5 (providing background on named Plaintiffs' investments and losses); Pl.'s

Reply Br. in Support of Class Certification [Doc. No. 87] ("Pls.' Cert. Reply Br.") at 18

(modifying proposed class period to commence on January 26, 2010, rather than on

January 1, 2008).)

Defendant Royal Bank of Canada Capital Markets, LLC ("RBC") is the brokerage

firm, or "broker-dealer," that sold (or, better put, facilitated the sale of) the RCNs at issue

in this litigation. RBC is a Minnesota corporation with its principal place of business in

New York City, New York. (*See* Am. Answer [Doc. No. 46] ¶ 10.)[2]

2. *Reversible Convertible Notes ("RCNs"), and How They Are Regulated*

---

[1]     Although the Amended Complaint [Doc. No. 18] listed Gary and Caryl Luis and
Gary Mentz as class representatives, in lieu of Susan Millering and Lois Boelter,
Plaintiffs changed their proposed class representatives shortly before filing their motion
for class certification.

[2]     It is not clear where the named Plaintiffs reside. However, regardless of the
answer to that question, it is undisputed that the Court may exercise jurisdiction over the
present motions under the Class Action Fairness Act of 2005 ("CAFA"). *See* 28 U.S.C. §
1332(d) (allowing federal courts to exercise jurisdiction over class actions based solely
on state law where (a) the proposed class membership exceeds 100, (b) *any* member of
that class is a citizen of a different state than that of the defendant, and (c) the aggregate
amount in controversy is over $5,000,000).

RCNs are a complex "structured financial product," that combine the consistent interest rate payments of a bond with the inherent riskiness of a stock. (*See generally* McCann Ex. Rep. [Doc. No. 86-1] ¶¶ 26-42.) In a prior decision in this case, the Court summarized the product as follows:

> [RCNs] are, at bottom, a form of bond, consisting of a high-yield, short-term note of the issuer that is *linked* to the performance of an unrelated reference asset – generally a stock or basket of stocks. RCNs thus contain two components: a [bond] paying an above-market interest rate (occasionally as high as 30%), *and* a [stock] derivative, in the form of a put option. [This put option] gives the issuer the right to repay principal to the investors in the form of a set amount of the underlying [stock] . . . *if* the price of the [stock] dips below a predetermined price (often referred to as the 'knock-in' level). It is this underlying option that gives RCNs greater risk than a traditional bond, because, [if the price of the 'reference asset' falls below the 'knock-in' level], an investor may ultimately lose *all* of his or her principal investment, and be left with only a depreciated asset in return.
>
> *Luis v. RBC Capital Markets*, No. 16-cv-175 (SRN/JSM), 2016 WL 6022909, at *1 (D. Minn. Oct. 13, 2016) (emphases added) (cleaned up) (hereinafter "*Luis I*").

In other words, when an investor buys an RCN, they are not buying a traditional bond – they are *betting* that a reference stock (or basket of stocks) will stay at a certain price level, and are then receiving above-market "interest rate payments" in exchange for taking one side of that bet. (The Court uses the word "bet" because, again, if the reference stock falls below the fixed price level, the investor stands to lose some, or all, of their principal investment.) Indeed, in a July 27, 2011 staff report, the SEC referred to RCNs as "perhaps the riskiest [structured financial product] available to retail investors." (July 27, 2011 SEC Staff Report on Issues Identified in Examinations of Certain Structure Securities Products Sold to Retail Investors [Doc. No. 86-2] at 4-5.)

When it comes to the regulation of this "risky" financial product, then, the most important cop on the beat is the financial industry's "self-regulatory organization," called the "Financial Industry Regulatory Authority," or "FINRA" for short. *See generally* Andrew F. Tuch, *The Self-Regulation of Investment Bankers*, 83 Geo. Wash. L. Rev. 101, 117-142 (2014) (providing detailed background on FINRA, and describing it as the "primary" regulator of broker-dealers like RBC). Although FINRA technically sits below the Securities & Exchange Commission ("SEC"), Congress has nonetheless invested FINRA with the authority to pass rules with the force of law, enforce those rules through both arbitration and administrative proceedings, and issue guidance about its rules, which are usually called "Notices to Members." *Id.*; *see also Fiero v. FINRA*, 660 F.3d 569, 578-79 (2d Cir. 2011) (distinguishing between FINRA rules promulgated through notice-and-comment rulemaking, which carry the force of law, and FINRA "Notices to Members," which do not).[3]

One FINRA rule, and three FINRA "Notices to Members," are relevant here.

The relevant rule is FINRA Rule 2111(a), also known as the "suitability" rule. (*See* Rule 2111 [Doc. No. 73-1].) This rule, which has existed in one form or another for

---

[3]     The Supreme Court recently re-affirmed this distinction, too: "An interpretive rule [or guidance document] itself never forms the basis for an enforcement action—because . . . such a rule does not impose any legally binding requirements on private parties. An enforcement action must instead rely on a legislative rule, which (to be valid) must go through notice and comment." *Kisor v. Wilkie*, --- U.S. ---, 2019 WL 2605554, at *12 (June 26, 2019) (cleaned up).

decades,[4] provides that FINRA-regulated brokers, such as RBC, "*must* have a *reasonable basis* to believe that a recommended transaction or investment strategy involving a security or securities is *suitable* for the customer, based on the information obtained through reasonable diligence of the [broker] to ascertain the customer's investment profile." (*Id*. (emphases added).) The Rule then lists a non-exhaustive series of factors a broker should consider as part of its "suitability" analysis, such as "the customer's age," "past investment experience," "financial situation and needs," "investment objectives," and "risk tolerance." (*Id*.) However, the Rule neither bars the sale of any particular financial product, nor calls out any particular product for special scrutiny. The Rule also does not mandate any specific documentation requirements. In effect, then, the Rule functions as a kind of broad duty of care for brokers to abide by when recommending securities (such as RCNs) to their clients. *See* Onnig M. Dombalagian, *Investment Recommendations and the Essence of Duty*, 60 Am. U. L. Rev. 1265, 1297 (2011) (describing the "FINRA suitability rule" as a "middle ground between the undue paternalism associated with fiduciary duties and the assumption of sophistication and rational decision making associated with disclosure-based approaches").

---

[4]     Although FINRA Rule 2111 was technically adopted in July 2012, the Rule was essentially a word-for-word adoption of a longstanding National Association of Securities Dealers ("NASD") rule, NASD Rule 2310(a). *See also* Tuch, *Self-Regulation*, at 104, 112 (explaining that "FINRA was formed in 2007 to supersede [NASD], the body founded in 1939" as the original securities self-regulatory organization).

That said, on at least three occasions, FINRA (and its predecessor agency, NASD) have provided further guidance as to how Rule 2111 (and related FINRA rules) should apply to the sale of "structured financial products" like RCNs.

**First**, and most importantly, is Notice to Members ("NTM") 5-59, issued in September 2005. (*See* NTM 5-59 [Doc. No. 73-1].) This NTM "provides guidance concerning the sale of structured products," albeit without mentioning RCNs by name. (*Id*. at 1.) More specifically, the NTM discusses "suitability" in terms of both "eligibility" (also known as "*per se* suitability"), and "case-by-case suitability." With respect to "eligibility," the NTM notes that broker-dealers "*should*" "consider whether purchases of some or all structured products should be limited to investors that have accounts that have been approved for options trading." (*Id*. at 4.) But, the NTM continues, if a broker allows customers who have not been "approved for options trading" to purchase "structured products," the broker "*should*" "develop other comparable procedures designed to ensure that structured products are only sold to persons for whom the risk of such products is appropriate." (*Id*.) The NTM does not further define "other comparable procedures."

The next section of NTM 5-59, titled "Suitability and Fair Dealing with Customers," essentially parrots Rule 2111, and asserts that, even if a client account is "eligible" to trade a particular structured product as a general matter, a broker *must* make a "relative suitability" determination on a "customer-specific" basis, too. (*Id*. at 5-6; *see also id*. at 6 ("Suitability *must* be determined on an investor-by-investor basis, with reference to specific facts and circumstances of each investor.").) This is so because "not

every structured product will be suitable for every account approved to trade structured products." (*Id*. at 4.)

NTM 5-59 concludes by noting that, to ensure compliance with "all applicable securities laws, and SEC and [FINRA] rules," including FINRA Rule 2111, brokerages should also create "supervisory control systems" and "training systems." (*Id*. at 7.)

The *second* relevant guidance document is NTM 10-09, issued in February 2010. (*See* NTM 10-09 [Doc. No. 73-1].) In essence, this NTM repeats NTM 5-59, except this time with particular reference to RCNs. For instance, the NTM notes, "[b]efore recommending a [RCN] to a retail customer, a registered [broker] *should* discuss the product with the customer to ensure that the customer makes an informed decision about whether to purchase the [RCN]." (*Id*. at 1.) The NTM then reiterates the "eligibility," "suitability," "supervisory control systems," and "training" guidance noted above, in materially identical language. (*Id*. at 6-8.)

The *third* relevant guidance document is NTM 12-03, issued in January 2012. (*See* NTM 12-03 [Doc. No. 73-1].) This NTM again reiterates the key concerns from NTM 5-59 and NTM 10-03, and then states that this guidance should result in "heightened supervision of complex [financial] products" like RCNs. (*Id*. at 1.) To that end, the NTM announces, brokerages "*should*" enact "formal written procedures to ensure that their registered representatives do not recommend a complex product to a retail investor before it has been thoroughly vetted," and "*should*" "consider requiring some level of supervision by a specially qualified supervisor of these recommended transactions." (*Id*. at 6, 8.)

### 3. *How RBC Sells RCNs To Its Clients*

RBC, like many broker-dealers, is actively engaged in the sale of RCNs. (*See, e.g.*, McCann Rep. ¶ 43 (noting that RBC "issued over 3,500" RCNs between January 1, 2008 and January 19, 2017).) In order to comply with the aforementioned FINRA rules and guidance, then, RBC adheres to the following three-step process.

*First*, RBC enters into a contract with each individual client, called the "Client Account Agreement." (*See* Housh Dep. [Doc. No. 79-2] at 28.) The only notable aspect of this contract for present purposes is the aforementioned "Applicable Laws and Regulations" paragraph. (*See* Client Account Agreement [Doc. No. 79-3] at 5.) The paragraph is number "16" in a list of paragraphs detailing "terms" a client must agree to "in consideration of [RBC] . . . opening an account" on their behalf. (*Id*. at 1.)

Specifically, in context, the paragraph reads as follows:

> In consideration of [RBC] continuing to or now and hereafter opening an account or accounts (collectively, the 'Account') for the purchase and sale of securities and commodities for me, or in my name, I agree that all transactions with respect to any such Account shall be subject to the following terms. . . . .

> **16. Applicable Laws and Regulations**

> All transactions in my Account shall be subject to all applicable laws and the rules and regulations of all federal, state and self-regulatory agencies, including, but not limited to, the Securities and Exchange Commission, the Commodity Futures Trading Commission, the New York Stock Exchange, Inc., ('NYSE'), FINRA, the Board of Governors of the Federal Reserve System, and the constitution, rules, and customs of the exchange or market (and the related clearing facility or entity) where executed, as the same may be amended or supplemented from time to time.

(*Id.* at 1, 5.)[5]

*Second*, RBC gathers basic financial information about each client through a document called "Client Account Information." This document asks a client to list, among other things, (a) their age, (b) their occupation, (c) their "number of years as an investor," (d) their "investment experience," (e) their number of dependents, (f) their estimated tax bracket, (g) their annual income and net worth, and (h) their "investment objective." (*See* Pls.' Client Account Information Forms [Doc. No. 79-4].) A client can describe their "investment objectives" as either "preservation of principal/income," "balanced/conservative growth," "growth," "aggressive growth," or "speculation." (*Id.*)[6]

*Third*, with respect to the sale of RCNs, RBC requires its brokers to look through this "Client Account Information," in addition to other information gleaned through the broker's own investigation, and determine whether RCNs are "suitable" for a client under

---

[5]     As the Court noted above, this case's disposition centers solely around this contractual provision. However, for clarity's sake, the Court will forgo a more detailed analysis of this provision until the "discussion" section of this opinion.

[6]     Although the Client Account Information Forms in the record list these five options as part of a singular "investment objective" inquiry, at some point during 2015 RBC began asking separate "risk tolerance" and "investment objective" questions. (*See* Straney Dep. [Doc. No. 86-1] at 32-33.) Under this latter formulation, a client can describe their "risk tolerance" as either "low," "moderate," "aggressive," or "very aggressive," and then their "investment objective" as either "preservation of principal/income," "balanced/conservative growth," "growth," "aggressive growth," or "speculation." (*Id.*; *see also* Straney Rep. [Doc. No. 86-1] at Appendix C (listing "investment objectives" and "risk tolerances" for random selection of 25 RCN-purchasing RBC accounts).)

RBC's *internal* rules (which are themselves a response to the FINRA rules and guidance discussed above). (*See generally* RBC Compliance Manual [Doc. Nos. 86-1 to 86-2].)

As recommended by NTM 5-59, RBC's internal rules treat "suitability" in terms of both "eligibility" and "case-by-case suitability." For instance, with respect to eligibility, since June 2013, RBC has barred its brokers from selling RBCs to clients with either "investment objectives" of "preservation of principal/income" or "balanced/conservative growth," *or* "risk tolerances" of "minimal" or "low." (June 7, 2013 RBC Policy Change Announcement [Doc. No. 86-2].) As part of this "eligibility" inquiry, RBC also requires its brokers to "carefully consider other aspects [of a client's investment profile] relating to the suitability of [RCNs]," such as whether the client has a liquid net worth over $100,000, whether the client has a net worth over $250,000 excluding their home, whether the client is under the age of 80, whether the client has "limited" investment experience, and whether the client has a "concentration" of RCNs in their investment portfolio, prior to purchasing an RCN on behalf of a client. (*Id.*) If a client fails to meet one of these criteria, the policy states, that client is presumptively barred from purchasing an RCN, unless the broker fills out a written recommendation form explaining why the RCN is nonetheless suitable for that client. (*Id.*)[7]

---

[7]      RBC had a similar policy prior to June 2013, too, in that an "eligible" RCN client needed to have an "investment objective" *other than* "preservation of principal/income," *and* a "minimum" of "$100,000 annual income, $100,000 liquid net worth, $250,000 net worth, [and/or] 2+ years of investment experience." (RBC May 2012 Compliance Manual [Doc. No. 86-2] at 137.)

What's more, even if a client is "eligible" to purchase an RCN under these internal guidelines, RBC requires its brokers to undertake an individual suitability analysis with each client at the moment of purchase, too. (*See, e.g.*, RBC Overview of Reverse Convertible Notes [Doc. No. 86-2] ("When recommending the purchase of [an RCN], the [broker] and his/her [supervisor] must ensure that the investment is consistent with the client's financial goals considering factors, among others, such as investment objectives, net worth, age, investment time horizon, liquidity needs, risk tolerance, financial experience, and background.").)

Once an RBC broker determines that a client meets these eligibility/suitability criteria, though, the broker is permitted to purchase RCNs on behalf of that client. This is true even if the client has not signed a separate "options trading agreement" with RBC. (*See* Housh Dep. at 42, 47.)

### 4. *On February 29, 2015, FINRA Enters into a Consent Decree with RBC Regarding RBC's Sales of RCNs*

At some point in 2013, FINRA began investigating several broker-dealers, including RBC, over their sale of RCNs. During its investigation of RBC, FINRA discovered that, between 2008 and 2012, RBC's brokers approved "approximately 364 [RCN] transactions in approximately 218 customer accounts that were unsuitable for those customers," as "suitability" was defined under the aforementioned internal RBC policies. (RBC Consent Decree [Doc. No. 79-1] at 2; *see, e.g.*, *id.* at 6 ("RBC permitted its registered representatives to recommend and sell 237 unsuitable [RCNs] in more than 100 customer accounts that listed the conservative investment objective of 'Preservation

of Principal/Income.'").) These transactions resulted in "customers incurring losses totaling at least $1.1 million." (*Id*.)

In light of this discovery, on February 29, 2015, FINRA entered into a consent decree with RBC, in which FINRA made its allegations against RBC public (albeit without RBC accepting the allegations as true) in return for RBC paying a $1 million fine to FINRA and $433,898.10 in restitution to harmed customers. (*See id*. at 6-7.) As part of this decree, FINRA also agreed to "not bring any future actions against RBC alleging violations based on the same factual findings described herein." (*Id*. at 1.)

Notably, though, in accusing RBC of misconduct, FINRA focused exclusively on RBC's "unreasonably designed surveillance systems," rather than on the propriety of the company's "eligibility" and "suitability" criteria *per se*. (*See, e.g.*, *id.* at 5 ("[RBC] failed to ensure that it implemented reasonably designed systems and procedures to flag for its supervisory personnel potentially unsuitable transactions in [RCNs] [according to RBC's internal policies] and ensure that its registered persons were adequately trained regarding the risks associated with [RCNs] and the customers for whom such investments were suitable."); *accord* Lund. Dec. [Doc. No. 86-2] (testimony from former RBC broker, in which he explains that RBC did not train him in "regulatory or internal guidance" concerning the "suitability" of RCNs for risk-averse clients).)

## B. Procedural Background

### 1. *Luis I*

Approximately a year after RBC entered into this consent decree with FINRA, Plaintiffs commenced this litigation. In their initial complaint, filed on January 26, 2016,

Plaintiffs asserted claims of "common law fraud," "fraudulent concealment," "two violations of the Minnesota Securities Act," "common law negligence," "breach of fiduciary duty," and "breach of contract." *Luis I*, 2016 WL 6022909, at *2. The seven claims all centered around the same allegations, namely, that RBC "engaged in a series of actions *designed* to hide the true risk of [RCNs] from investors, while *pushing them on* individuals who had expressly indicated an unwillingness to partake in options trading [or other risky investment strategies]." *Id*. at *2 (emphasis added).

RBC promptly moved to dismiss Plaintiffs' complaint in full, on grounds that the claims asserted therein were precluded by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"). *See id*. (noting that SLUSA "precludes maintenance – in either state or federal court – of any 'covered class action' based on state law and alleging either (a) a 'misrepresentation or omission of a material fact' in connection with the purchase or sale of a covered security, or (b) the use or employment of any 'manipulative or deceptive device or contrivance' in connection with the purchase or sale of a covered security").

On October 13, 2016, the Court granted RBC's motion, over Plaintiffs' objection. Specifically, this Court found, "each of Plaintiffs' claims," including their "breach of contract" and "negligence" claims, "relie[d] on the same set of allegations, including that RBC *intentionally* failed to follow customers' expressed instructions regarding investment risk, *misrepresented* the nature and safety of RCNs as investments, and *omitted material information* regarding legal and regulatory actions relating to RCNs." *Id*. (emphasis added). Therefore, the Court concluded, SLUSA precluded Plaintiffs'

14

complaint in full. *See id.* at *4 (observing that "[t]he essence of the complaint was an allegation of fraud," and that "rephrasing the duty to avoid material omissions as a breach of contract does not change the nature of the underlying wrong").

## 2. *Luis II Complaint*

This dismissal did not end the litigation. Rather, less than a month later, on November 10, 2016, Plaintiffs regrouped and filed a one-count breach of contract claim. (*See* Compl. [Doc. No. 1]; Am. Compl. [Doc. No. 18].) The essence of this complaint was that the contract governing Plaintiffs' relationship with RBC (*i.e.*, the Client Account Agreement) barred RBC from trading "uncovered" or "naked" put options on a client's account *unless* that client had executed a separate "Options Agreement" with RBC. *See Luis v. RBC Capital Markets*, 2017 WL 4150872, at *2 (hereinafter "*Luis II*"); *see also* Doc. No. 42. Because RCNs are essentially "naked put options," and because RBC sold RCNs to a putative class of Plaintiffs who had *not* executed that separate Options Agreement, the argument went, RBC's sale of RCNs to those Plaintiffs constituted a breach of contract. *Id.*

Again, RBC moved to dismiss Plaintiffs' complaint, both under SLUSA and under the *Twombly*/*Iqbal* pleading standard. This time, however, the Court agreed with Plaintiffs, and denied RBC's motion in full. With respect to SLUSA, the Court found that Plaintiffs' breach of contract claim was "distinct" from *Luis I* because Plaintiffs' refashioned complaint simply alleged (1) that "a contract with a specific obligation on the part of RBC" existed between Plaintiffs and RBC, *i.e.*, "that RBC not sell or purchase [certain] options without Plaintiffs' written authorization," and (2) that "RBC violated

that obligation, breaching the contract." *Id*. at *5. The Court could not locate an allegation that RBC "secretly intended to breach the contract when it was formed," or that "misrepresentation hid[] in the substance" of Plaintiffs' breach claim. *Id*. at *4. Accordingly, the Court concluded, SLUSA did not bar Plaintiffs' claim. *See id*. ("Just as plaintiffs cannot avoid SLUSA through artful pleading, defendants may not 'recast contract claims as fraud claims by arguing that they 'really' involve deception or misrepresentation.") (quoting *Freeman Invs., LP v. Pac. Life Ins. Co.*, 704 F.3d 1110, 1116 (9th Cir. 2013)).

The Court also concluded that Plaintiffs alleged a plausible breach of contract claim, under the *Twombly/Iqbal* pleading standard. Although the Court acknowledged that RBC disagreed with Plaintiffs' interpretation of the Client Account Agreement and the related Options Agreement, the Court nonetheless determined that, because Plaintiffs sufficiently alleged the elements of a breach claim, they were entitled to proceed to discovery. *See id.* ("Plaintiffs sufficiently allege that: (1) they formed contracts with RBC that indicated the instructions and authorizations necessary for RBC to buy or sell options in Plaintiffs' accounts; (2) Plaintiffs fully performed their contractual obligations by paying RBC commissions or management fees; (3) RBC breached the parties' contracts by issuing naked put options without acquiring Plaintiffs' written authorizations, as required by the contracts; and (4) RBC's actions caused Plaintiffs to suffer damages. Certainly, RBC construes the parties' agreements differently, but Plaintiffs have plausibly alleged the elements of a breach of contract claim under Minnesota laws.").

### 3. *Luis II, as Currently Construed*

As often happens in litigation, though, Plaintiffs' breach claim evolved over the course of discovery. Specifically, during deposition practice, Plaintiffs learned that RBC did not have an internal policy, or contractual provision, *requiring* clients to execute an "Options Agreement" in order to be eligible to purchase RCNs. (*See* Pl.'s Cert. Br. at 1 n.1; *accord* Housh Dep. at 42, 47.) In light of this development, Plaintiffs shifted their focus away from RBC's "Options Agreement," and toward the "Applicable Laws and Regulations" provision in the Client Account Agreement. (*See supra* at 9-10 (setting forth this provision).) This provision mattered, Plaintiffs argued, because it was essentially a promise that RBC "would comply with" all governing FINRA rules and guidance, including those discussed above, and because RBC (allegedly) did *not* comply with those rules and guidance when it allowed Plaintiffs to purchase RCNs. (Pls.' Br. in Opp. to Def.'s Mot. for Summ. J. [Doc. No. 85] ("Pls.' Summ. J. Opp. Br.") at 1.)

Thus, under Plaintiffs' revised theory of the case, RBC breached its contract on a class-wide basis for the following four reasons: **(1)** the aforementioned FINRA rules and guidance (allegedly) *barred* RBC, as a matter of law, from selling RCNs to clients who did not list their "investment objectives" or "risk tolerance" as "aggressive" or "speculative" on their Client Account Information,[8] **(2)** on their Client Account

---

[8]    Notably, Plaintiffs do not root this purported "eligibility *requirement*" in the plain text of either FINRA Rule 2111, or any of the NTMs discussed above. Rather, Plaintiffs base it on the testimony of their expert witness, Louis L. Straney, and on language used in a September 28, 2016 consent decree between the SEC and UBS Financial Services (which related to UBS's sale of RCNs). (*See* Straney Rep. ¶¶ 26-27; UBS Consent Decree [Doc. No. 86-2] at 5.)

Information form, Plaintiffs did not list their "investment objectives," or "risk tolerance," as "aggressive" or "speculative," **(3)** RBC sold Plaintiffs RCNs, allegedly in violation of these rules and guidance (and, by extension, in breach of the Client Account Agreement), and **(4)** Plaintiffs lost money as a result of that breach.

### 4. *Pending Motions for Class Certification and Summary Judgment*

With this revised understanding of the case in hand, on January 22, 2019, Plaintiffs moved to certify the following damages class, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3):

> All RBC customers who purchased from January 26, 2010 to the present, [RCNs] that were repaid (or converted to) shares of common stock of a publicly-traded corporation other than the issuer of the [RCN], and whose investment objective / risk tolerance, as stated on the customer's Client Account Information Form, was other than "aggressive" or "speculative."

> (Pls.' Cert. Br. at 7.)

Around the same time, however, RBC moved for summary judgment with respect to the named Plaintiffs. (*See* Def.'s Br. in Support of Summ. J. [Doc. No. 78] ("Def.'s Summ. J. Br.").) Specifically, RBC contended, Plaintiffs' revised theory of the case failed to state an actionable breach of contract claim because **(1)** a party to a contract cannot use a provision like the "Applicable Laws and Regulations" paragraph "to convert a statutory or regulatory violation into a breach of contract claim," **(2)** even if that contractual provision did allow regulatory violations to be converted into a breach of contract claim, RBC did not violate any relevant FINRA *rules* (which, unlike the NTMs, are actually considered a "law or regulation" governed by the contractual provision), **(3)** even if the NTMs were treated as binding "law or regulations," enforceable through the contract,

RBC did not violate the NTMs, and, finally, **(4)** even if a reasonable juror could find that RBC violated the rules and guidance at issue, Plaintiffs' current breach claim more closely resembles their *Luis I* complaint than their *Luis II* complaint, and is therefore precluded under SLUSA. (*Id*. at 2.)

The parties then filed briefs for and against each other's motions, along with hundreds of pages of supporting evidence. (*See* Pls.' Cert Br.; Def.'s Br. in Opp. to Cert. [Doc. No. 82] ("Def.'s Cert. Opp. Br."); Pl.'s Cert. Reply Br.; Def.'s Summ. J. Br.; Pls.' Summ. J. Opp. Br.; Def.'s Reply in Support of Summ. J. [Doc. No. 89] ("Def.'s Summ. J. Reply Br.").)

On April 25, 2019, the Court entertained oral argument with respect to both motions.

## II.    DISCUSSION

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, and the Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).[9]

---

[9]      Because the Court can resolve this case on summary judgment, it will not discuss either Plaintiffs' motion for class certification or the legal standards applicable to that motion. *Accord Nelson v. Am. Family Mut. Ins. Co.*, 262 F. Supp. 3d 835, 863 (D. Minn. 2017) (granting defendant summary judgment, and then declining to consider plaintiffs'

Here, the Court will solely discuss RBC's first proposed basis for summary judgment – that a party to a contract cannot use a provision like the "Applicable Laws and Regulations" paragraph "to convert a statutory or regulatory violation into a breach of contract claim" (Def.'s Summ. J. Br. at 2) – because it is RBC's strongest argument, and because it single-handedly supports a grant of summary judgment here.

## A. The Law

Under Minnesota law,[10] a breach of contract claim has four elements: "(1) formation of a contract; (2) performance by plaintiff of any conditions precedent; (3) a material breach of the contract by defendant; and (4) damages." *Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd.*, 703 F.3d 1104, 1107 (8th Cir. 2013) (quoting *Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F. Supp. 2d 951, 961 (D. Minn. 2000)). This order focuses on the third element, *i.e.*, "material breach of the contract." More specifically, the Court must determine whether the "Applicable Laws and Regulations" provision of the Client Account Agreement required RBC to "comply with" certain FINRA rules and guidance, such that RBC could be held liable for breach of contract if it failed to comply with those rules and guidance.

---

motion for class certification); *see also In re Nat'l Hockey League Players' Concussion Injury Litig*., 14-mdl-2551 (SRN/BRT), 2017 WL 3141921, at *2 (D. Minn. July 24, 2017) ("[R]uling on summary judgment prior to class certification is permissible, particularly where doing so would facilitate efficient resolution of the case.").

[10]     Because the Client Account Agreement contains a Minnesota choice-of-law provision, it is undisputed that Minnesota law governs this breach claim. (*See* Client Account Agreement at 7 (paragraph 20).)

The interpretation of *unambiguous* contractual language is a question of law for the Court. *See Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 913 N.W.2d 687, 692 (Minn. 2018). By contrast, if the Court determines that contractual language is ambiguous, the interpretation of that language, and the accompanying issue of the parties' intent, "becomes a question of fact for a jury." *Id*. It is well established, however, that a "contract's terms are not ambiguous simply because the parties' interpretations differ." *Id*. Indeed, as the Eighth Circuit has noted (when interpreting Minnesota law), courts must "fastidiously guard against the invitation to create ambiguities where none exist," and must endeavor to interpret words in a contract in accordance with their "plain and ordinary meaning." *In re SRC Corp.*, 545 F.3d 661, 666 (8th Cir. 2008).

Importantly, too, Minnesota courts have held that, just because a contract includes language stating that the contract is "subject to," or "governed by," certain rules and regulations, that does *not* mean that a violation of those rules and regulations constitutes a breach of contract. *See, e.g.*, *Burgmeier v. Farm Credit Bank of St. Paul*, 499 N.W.2d 43, 47 (Minn. Ct. App. 1993) (reasoning that, although mortgage contract stated that it was "subject to" the Farm Credit Act, "this language alone [was] insufficient to create rights or obligations in the parties [with respect to the Farm Credit Act], and [could not] support a breach of contract action"); *Prod. Credit Ass'n of Worthington v. Van Iperen*, 396 N.W.2d 35, 38 (Minn. Ct. App. 1986) (similarly holding that agreement stating that a loan was "governed by the Farm Credit Act of 1971 and its regulations" did not create a cause of action for breach based upon violations of the Act).

Federal courts in other jurisdictions have reached the same conclusion in the securities trading context, too. *See, e.g.*, *Gurfein v. Ameritrade, Inc.*, 312 Fed. App'x 410, 413 (2d Cir. 2009) (holding that the contractual provision, "[a]ll my option transactions are *subject to* the rules and regulations of [certain financial industry regulators]," simply "memorialized" the plaintiff's "acknowledgment that her trades [were] subject to applicable rules and regulations," and neither "incorporate[d] into the contract the rules and regulations of those outside regulatory bodies," nor "impose[d] any contractual obligations on [the defendant]"); *Hauptman v. Interactive Brokers, LLC*, 17-cv-9382 (GBD), 2018 WL 4278345, at *7 (S.D.N.Y. June 12, 2018) (same); *Lanier v. BATS Exch., Inc.*, 105 F. Supp. 3d 353, 367 n.6 (S.D.N.Y. 2015) (same); *Appert v. Morgan Stanley Dean Witter, Inc.*, No. 08-cv-7130, 2009 WL 3764120, at *4 (N.D. Ill. Nov. 6, 2009) (same).

What's more, these courts hold, this narrow interpretation of "subject to" makes particular sense when the rules and regulations are not themselves enforceable by way of a private cause of action. *See, e.g.*, *Burgmeier*, 499 N.W.2d at 47 (noting that the legislature had not created a "private right of action" to enforce either the Farm Credit Act or its amendments); *Gurfein*, 312 Fed. App'x at 414 (same, with respect to the "NYSE" and "NASD" "rules and by-laws"). This is so, the logic goes, because "allowing [a plaintiff] to assert a private breach of contract claim" under a mere "subject to" clause "would vitiate Congress's intent not to allow private rights of action" under the at-issue rule or regulation. *MM&S Fin., Inc. v. Nat'l Ass'n of Secs. Dealers, Inc.*, 364 F.3d 908, 912 (8th Cir. 2004); *accord Van Iperen*, 396 N.W.2d at 38; *Gurfein*, 312 Fed. App'x at

414; *Hauptman*, 2018 WL 4278345, at *7-8; *Lanier*, 105 F. Supp. 3d at 367 n.6; *Appert*, 2009 WL 3764120, at *3.

In fact, the Eighth Circuit has held (when interpreting Minnesota law), this separation-of-powers principle applies with particular force when the at-issue rule or regulation arises under a "comprehensive regulatory scheme," where courts have "historically" afforded the government "deference" "in enforcing the law." *See Palmer v. Ill. Farmers Ins. Co.*, 666 F.3d 1081, 1084-86 (8th Cir. 2012) (affirming dismissal of breach-of-contract claims alleging violation of an automobile insurance statute).

## B. Analysis

This law compels summary judgment in favor of RBC, for two different reasons.

*First*, although the parties present starkly differing interpretations of the "Applicable Laws and Regulations" paragraph, the provision can *only* be read in the manner RBC proposes, that is, as an "acknowledgement" by the client that the transactions executed through their account will be "*subject to* a complex legal framework." (Defs.' Summ. J. Reply Br. at 5 (emphasis added).) Under this reading of the contract, which the Court may reach as a matter of law, RBC was not under a duty to "comply with" FINRA rules and guidance, and, consequently, RBC cannot be held liable for breaching that (non-existent) contractual duty. (*Contra* Pls.' Summ. J. Opp. Br. at 1 (interpreting the provision as a "promise" from RBC to its clients that "'all transactions' in their account would *comply with* 'all applicable laws and regulations . . .'") (emphasis added).)

***Second***, to the extent there is any doubt as to this first reason, the separation-of-powers concern noted above confirms that Plaintiffs cannot enforce FINRA rules and guidance through the "Applicable Laws and Regulations" paragraph, and that, consequently, Plaintiffs cannot advance a breach claim here.

The Court will address each argument in turn, and will also address Plaintiffs' relevant counterarguments along the way.

The Court will ***first*** focus on the "plain and ordinary meaning" of the "Applicable Laws and Regulations" provision, *In re SRC Corp.*, 545 F.3d at 666, and on how other courts have interpreted similar language. For ease of reference, the Court will again set forth, in full, the provision's language:

> *In consideration of* [RBC] continuing to or now and hereafter opening an account or accounts (collectively, the 'Account') for the purchase and sale of securities and commodities for me, or in my name, *I agree that all transactions* with respect to any such Account *shall be subject to* the following terms. . . . .
>
> **16. Applicable Laws and Regulations**
>
> All transactions in my Account *shall be subject to* all applicable laws and the rules and regulations of all federal, state and self-regulatory agencies, including, but not limited to, the Securities and Exchange Commission, the Commodity Futures Trading Commission, the New York Stock Exchange, Inc., ('NYSE'), FINRA, the Board of Governors of the Federal Reserve System, and the constitution, rules, and customs of the exchange or market (and the related clearing facility or entity) where executed, as the same may be amended or supplemented from time to time.
>
> (*Supra* at 9 (emphasis added).)

As is evident, this provision is written in the first person, from the vantage point of the client, *e.g.*, "All transactions in *my* Account . . .," and is included in a list of "terms"

the *client* is agreeing to, "in consideration of" RBC opening a securities trading account

on their behalf. In other words, there is no indication in this provision that the broker,

RBC, is agreeing to do anything on the client's behalf.

Indeed, in *Gurfein*, which the Court noted above, the Second Circuit considered

virtually identical contractual language, and reached this same conclusion. There, the

contract read as follows:

> In consideration of Ameritrade handling options transactions for my
> account, I am aware of and agree as follows: . . . All my option
> transactions are subject to the rules and regulations of the Options Clearing
> Corporation, the Chicago Board Options Exchange or the appropriate
> options exchange, and the National Association of Securities Dealers, Inc.
>
> *Gurfein*, 312 Fed. App'x at 413.

Although Gurfein (the plaintiff) interpreted this provision in a manner analogous

to Plaintiffs here, the Second Circuit succinctly pointed out the weakness of that

argument:

> This section, drafted in the first person, memorializes only Gurfein's
> acknowledgment that her trades are subject to applicable rules and
> regulations. The *unambiguous* language at issue puts Gurfein on notice that
> her electronic trades are governed by various entities' regulatory rules. The
> language, however, does not incorporate into the contract the rules and
> regulations of those outside regulatory bodies. Nor does it impose any
> contractual obligations on Ameritrade.
>
> *Id*. (emphasis added).

Although *Gurfein* is an unpublished opinion, the Second Circuit's reasoning has

proved persuasive. Most notably, since *Gurfein* was decided in 2009, three federal district

courts have wholeheartedly embraced the Second Circuit's interpretation of (virtually

identical) securities trading contracts, en route to dismissing (virtually identical) breach

claims. *See Hauptman*, 2018 WL 4278345, at *7; *Lanier*, 105 F. Supp. 3d at 367 n.6;

*Appert*, 2009 WL 3764120, at *4; *see also Knights of Columbus Council 3152 v. KFS

*BD, Inc.*, 791 N.W.2d 317, 324-26 (Neb. 2010) (same). More still, *Gurfein* and its

progeny accord with the two Minnesota Court of Appeals decisions discussed above,

which considered similar contractual language, albeit in a different statutory context. *See*

*Burgmeier*, 499 N.W.2d at 47; *Van Iperen*, 396 N.W.2d at 38.

Of course, Plaintiffs offer a different interpretation of the "Applicable Laws and

Regulations" provision. That is, in Plaintiffs' view, the plain language of the "Applicable

Laws and Regulations" provision should be interpreted as a "promise" from RBC to its

clients that "'all transactions' in the [client's account] would *comply with* 'all applicable

laws and regulations . . .'" (Pls.' Summ. J. Opp. Br. at 1 (emphasis added); *see also id*. at

9 (similarly describing the provision as a "promise" "to conduct transactions *only in*

*accordance with* applicable laws, regulations, rules, and customs") (emphasis added).)

And if RBC made such a promise in its contract with Plaintiffs, the argument goes,

Plaintiffs should be able to enforce FINRA "regulations" and "rules" by way of that

contract.

The Court acknowledges that there is some (very limited) legal support for this

position. *See, e.g.*, *Am. Trans Air, Inc. v. Am. Airlines, Inc.*, No. 96-cv-824, 1998 WL

567835, at *11-12 (S.D. Ind. Aug. 10, 1998) (Hamilton, J.,) (holding that contractual

provision stating, "American shall maintain and operate SABRE *in accordance with*

applicable [Department of Transportation regulations]," "unambiguously" showed that

"SABRE agreed to act in accordance with the [DOT] regulations," and that plaintiff

could accordingly hold American/SABRE liable for failing to comply with those regulations) (emphasis added); *cf. Fernandez v. UBS AG*, 222 F. Supp. 3d 358, 389-90 (S.D.N.Y. 2016) (holding that the contractual language, "As your broker/dealer, we *will* . . . *[d]etermine* the suitability of any recommendations and investment advice," could serve as basis for breach claim) (emphasis added).

However, the problem with applying this argument here is that the "Applicable Laws and Regulations" provision does not contain any such "promissory" language; the words "promise," "will comply with," and "shall act in accordance with," do *not* appear in the contract. Rather, the contract says, Plaintiffs' "transactions" "shall be *subject to* all applicable laws and regulations." And, for the reasons explained above, this phrase merely "memorializes" Plaintiffs' "acknowledgment that [their] trades are subject to applicable rules and regulations," and therefore cannot support a breach claim. *Gurfein*, 312 Fed. App'x at 413. Moreover, unlike the contract at issue in *Fernandez v. UBS AG*, the Client Account Agreement does not make any particular promises with respect to "suitability" or "eligibility."

Beyond this "plain language" argument, Plaintiffs also attempt to distinguish *Burgmeier* and *Gurfein* on their facts. The Court finds these arguments similarly unavailing.

With respect to *Burgmeier*, Plaintiffs point out that the "subject to" clause of the contract there applied to just "the mortgage contract," whereas the relevant provision here applied to "all transactions" made on a client's account (*See* Pls.' Summ. J. Opp. Br. at

23-24.) However, because Plaintiffs do not explain why this distinction matters, the Court finds this minor factual discrepancy immaterial.

With respect to *Gurfein*, Plaintiffs primarily contend that, unlike the contractual provision at issue there, the "Applicable Laws and Regulations" paragraph here "does not state that what is to come is given in consideration of RBC's handling of the account; it does not memorialize the duty of the client, but rather states what a client can expect from RBC." (*Id.* at 28.) This is not correct. As the Court explained above, the "Applicable Laws and Regulations" paragraph *is* a "term" agreed to by the client "in consideration of" RBC opening an investment account on the client's behalf. (*See supra* at 24-25.) The paragraph is not offering assurances regarding "what a client can expect from RBC." (Pls.' Summ. J. Opp. Br. at 28.) As such, this argument, along with Plaintiffs' other attempts to distinguish *Gurfein* (*see id.* at 27-30), fall short.

For these reasons, the unambiguous language of the "Applicable Laws and Regulations" provision favors RBC. That is, in contracting with Plaintiffs, RBC did *not* promise to abide by the at-issue financial industry regulations, and, consequently, Plaintiffs cannot base a breach of contract claim on RBC's failure to comply with those regulations.

**Second**, to the extent there is any doubt about the contract's plain language, RBC is also entitled to summary judgment because allowing Plaintiffs to enforce FINRA rules and guidance through this breach action "would vitiate Congress's intent not to allow private rights of action" for violations of those rules and guidance, and would accordingly

run against basic separation of powers principles. *MM&S Fin.*, 364 F.3d at 912.[11] Indeed, almost every court cited in the prior section also made note of this separation of powers concern in the course of its ruling. *See, e.g.*, *Gurfein*, 312 Fed. App'x at 414 (holding that, because "the regulatory rules themselves" did not "provide investors with a private right of action," "Gurfein [was] precluded from creating a private cause of action for violations of these rules and regulations by fashioning her claim as one for breach of contract"); *Hauptman*, 2018 WL 4278345, at *7 ("Plaintiffs cannot create [] a private right of action [to enforce a FINRA rule] by styling their claim as a breach of contract."); *Appert*, 2009 WL 3764120, at *3 (discussing the "general prohibition against asserting an implied right of action under the guise of a state law claim, where no independent right of action has been found to exist"); *see also Van Iperen*, 396 N.W.2d at 38 ("We will not impose a [contractual] obligation and remedy when the statute cannot be interpreted to create one.").

*Palmer v. Ill. Farmers Ins. Co.*, which the Court mentioned in passing above, is instructive on this point, too. There, a class of insureds sued their auto insurance companies for failing to provide a discount for cars that have anti-theft devices, as required by Minnesota statute. *See* Minn. Stat. § 65B.285, subdiv. 2 ("An insurer [must] provide an appropriate premium reduction of at least five percent on the comprehensive

---

[11]    It is undisputed that FINRA rules and guidance are not directly enforceable in federal court, by way of a private right of action. (*See* Pls.' Summ. J. Opp. Br. at 26-27, 34 (conceding that "no private right of action exists in court for violations of FINRA rules"); Apr. 25, 2018 Hr'g Tr. at 62-63 (same); *see also Gallier v. Woodbury Fin. Servs., Inc.*, No. 14-cv-888, 2015 WL 1296351, at *6 (S.D. Tex. Mar. 23, 2015) (collecting cases).)

coverage on a policy of private passenger vehicle insurance . . . to an insured whose vehicle is equipped with an authorized antitheft protection device."). Because their contracts with the insurers provided that "the insurer will calculate a premium based on information the insurer has received from the insured or other sources, or from information in the insurer's possession," and because the insurers "possessed information" that the insureds had anti-theft devices in their car, the insureds argued that failure to comply with the statutory anti-theft discount constituted a breach of contract. *Palmer*, 555 F.3d at 1084-85.

The Eighth Circuit rejected this argument as a matter of law. Because breach of contract claims relying on regulatory violations "*must* [] be considered in the context of [the] comprehensive regulatory scheme and the historical deference [] courts have afforded [the government] in enforcing the law in this area," and because Minnesota's automobile insurance "regulatory scheme" clearly favored government enforcement over private rights of action, the Eighth Circuit declined to "intervene in the administrative scheme of enforcement and create a contractual duty distinct from the statutory mandate." *Id*. at 1086 (emphasis added). "In the absence of antitheft protection language in [the insureds'] contracts specifying an independent right to the discount they seek," the Eighth Circuit continued, "the [insureds'] claims for breach attempt[ed] to circumvent Minnesota's administrative remedies and create a private right of action when the legislature [had] not," and were therefore impermissible. *Id*.

These principles apply with equal force here. As explained above, the alleged "eligibility/suitability" violations occurred within "the context of [a] comprehensive

regulatory scheme," *id.*, where courts have historically deferred to FINRA's internal enforcement mechanisms. *See, e.g.*, *Gurfein*, 312 Fed. App'x at 414; *Hauptman*, 2018 WL 4278345, at *7-8; *Lanier*, 105 F. Supp. 3d at 367 n.6; *Appert*, 2009 WL 3764120, at *3. Indeed, the consent decrees discussed in Plaintiffs' briefing (*see supra* at 12-13, n.8), show that FINRA (and, to some extent, the SEC) are actively involved in enforcing the specific "suitability" rules and regulations at issue here. It is also notable that, although Congress has not provided investors a private cause of action by which to enforce FINRA rules and regulations, FINRA provides investors a specialized arbitration forum by which they *can* enforce such rules or regulations; this forum remains available to the putative class members here. *See* FINRA Rule 12200 (stating that a registered broker-dealer "must" agree to arbitrate "a dispute under [FINRA's rules]" if "requested by the customer").[12] As such, separation of powers concerns also favor granting RBC summary judgment.

Plaintiffs' arguments to the contrary are not persuasive.

*First*, Plaintiffs attempt to distinguish *Palmer* by emphasizing that that case centered around Minnesota *state* insurance regulations, as opposed to the *federal* financial regulations at issue here. (*See* Pls.' Summ. J. Opp. Br. at 24-25.) But, because *Palmer*, along with all the other cases cited above, addressed a fundamental separation of powers concern, and not a concern tethered solely to state law, this distinction is immaterial.

---

[12] *Available at* http://finra.complinet.com/en/display/display_main.html?rbid=2403&element_id=4106.

*Second*, Plaintiffs also cite a number of cases for the proposition that, even if FINRA rules and guidance cannot be enforced by way of a private cause of action, courts may "rel[y] on such regulations for the applicable standards to determine the propriety of financial firms' conduct as an element of a common law claim." (Pls.' Summ. J. Opp. Br. at 34-36 (citing a multitude of cases).) The problem, however, is that all of Plaintiffs' cited cases are negligence actions, and accordingly have no applicability to a contract action like this one. *See, e.g.*, *Brink v. Raymond James & Assocs., Inc.*, 341 F. Supp. 3d 1314, 1325-26 (S.D. Fla. 2018) (finding that FINRA rules and guidance, when considered alongside expert testimony, could provide evidence as to "the *standard of care* owed by similar professional [brokers] . . . to customer/account holders such as [the plaintiff]") (emphasis added).

For these reasons, the Court grants RBC summary judgment.

## III.    ORDER

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [Doc. No. 76] is **GRANTED**, and Plaintiffs' Motion for Class Certification [Doc. No. 70] is **DENIED AS MOOT**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  July 11, 2019                    __/s/ Susan Richard Nelson___
                                        SUSAN RICHARD NELSON
                                        United States District Judge